**2022 IL 127149**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127149)

BRIAN J. STRAUSS *et al.*, Appellants, v. THE CITY OF CHICAGO, Appellee.

*Opinion filed September 22, 2022.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Justices Theis, Neville, Michael J. Burke, and Carter concurred in the judgment and opinion.

Chief Justice Anne M. Burke and Justice Holder White took no part in the decision.

**OPINION**

¶ 1    The building at issue in this case is located at 1572 North Milwaukee Avenue in Chicago. The 1572 North Milwaukee Avenue Building Corporation

(Corporation) owned the building, and plaintiff Brian J. Strauss [1] was the Corporation's president. Double Door Liquors (Double Door)—a music venue—was a tenant in the building. Numerous difficulties arose with Double Door, including lease violations, excessive noise levels, illegal drug use, alcohol abuse, and property damage. These problems resulted in the termination of Double Door's lease. The Corporation filed an eviction action against Double Door, which led to Double Door's eviction from the building. Subsequently, defendant, the City of Chicago (City) enacted a zoning ordinance that changed the types of establishments that were allowed in the building.

¶ 2       Plaintiffs' second amended complaint asserted claims challenging the zoning ordinance as well as claims based on certain conduct of Proco Joe Moreno—the local alderman—and the City that occurred before the zoning ordinance was enacted. Plaintiffs alleged several constitutional rights violations, as well as claims for money damages in tort. The circuit court dismissed the entirety of the complaint with prejudice. The appellate court affirmed the circuit court's dismissal, finding that, pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2016)), plaintiffs failed to state a claim for substantive due process or equal protection violations, as the complaint described the noise levels, drug and alcohol abuse, and property damage associated with Double Door, thereby establishing that the enactment of the zoning ordinance satisfied the rational basis test, as it was reasonably related to a legitimate government interest. 2021 IL App (1st) 191977, ¶¶ 42, 46. The appellate court further found the plain language of section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/2-201 (West 2016)) provided absolute immunity to the City on the tort claims. 2021 IL App (1st) 191977, ¶ 67. For the following reasons, we affirm the judgment of the appellate court, albeit on different grounds.

¶ 3                                    BACKGROUND

¶ 4                                    I. Federal Court

¶ 5       On July 20, 2017, plaintiffs filed a complaint against Moreno and the City in the United States District Court for the Northern District of Illinois Eastern Division

---

[1]Strauss filed suit in his individual capacity and "doing business as" the Corporation.

(Northern District). Subsequently, on January 8, 2018, plaintiffs filed a complaint against the City in the circuit court of Cook County, requesting declaratory, injunctive, and other relief. The case was removed from the circuit court and joined with the Northern District case, as both related to the same issues and set forth many of the same causes of action. The Northern District concluded the complaint did not state a federal claim that was ripe for adjudication. *Strauss v. City of Chicago*, 346 F. Supp. 3d 1193, 1211 (N.D. Ill. 2018). Accordingly, the litigation was dismissed without prejudice to plaintiffs' state law claims and remanded to the circuit court for plaintiffs to file a second amended complaint to conform with the Northern District's memorandum opinion and order. See *id.*

¶ 6                          II. Plaintiffs' Second Amended Complaint

¶ 7                                      A. Allegations

¶ 8        On February 19, 2019, plaintiffs filed a 10-count, second amended complaint in the circuit court, alleging as follows. The building is located at 1572 North Milwaukee Avenue in Chicago and had been owned by Strauss's family for nearly 40 years. Ownership of the building was incorporated as 1572 North Milwaukee Avenue Building Corporation, with Strauss named as president of the Corporation. The four-story building is in the heart of the Milwaukee-North-Damen corridor of Chicago—a thriving business district—and encompasses nearly 20,000 square feet of commercial businesses and residential apartments. The complaint alleged that, before the underlying litigation commenced, the estimated market value of the building was roughly $10 million.

¶ 9        The building had been zoned as B3-2 since 1974. The B3-2 zoning classification allowed residential apartments in the building above the street level, as well as commercial property such as shopping centers, retail storefronts, and large stores at the street level. At all relevant times, all other buildings along the Milwaukee-North-Damen corridor were zoned at B3-2 or greater.

¶ 10       Double Door had been a commercial tenant in the building. In 2012, Moreno— who had a personal and financial relationship with Double Door's owners— informed plaintiffs that only Double Door would be allowed to rent the building. However, during Double Door's lease, problems occurred with continually high

noise levels, illicit drug use and alcohol abuse by Double Door's patrons, and property damage by Double Door and its patrons. These problems, along with certain lease violations, resulted in the termination of Double Door's lease. In 2015, the Corporation filed an eviction action against Double Door.

¶ 11     On April 13, 2016—while the forcible entry and detainer litigation was pending—Moreno presented to the zoning committee[2] a downzoning amendment to apply solely to the building, leaving the zoning of the surrounding properties unchanged. The complaint alleged that Moreno introduced the downzoning amendment as a message for plaintiffs to keep Double Door as a tenant "or suffer the consequences." The complaint further alleged that one of Double Door's owners stated that Moreno planned the downzoning amendment to protect Double Door by making the property less appealing to potential future tenants.

¶ 12     Moreno's proposed amendment called for the zoning of the building to be changed from B3-2 to B1-1. The B1-1 zoning classification prohibited upper-level apartments and more than 30 types of businesses, including general restaurants, medium and large entertainment venues, and hotels. The complaint alleged that a zoning change to B1-1 would result in a significant decrease in property value and that the proposed amendment applied only to the building; treated the building differently from others in the neighborhood; amounted to illegal spot zoning; offered no benefit to the community; and was arbitrary, capricious, and indicative of Moreno's discriminatory intent.

¶ 13     On June 20, 2016, the zoning committee deferred the B1-1 downzoning proposal, making it available to be called for a vote at any time in the future. On July 19, 2016, Strauss met with Moreno, who again indicated that only Double Door would be allowed in the building. On August 15, 2016, the Corporation prevailed in the eviction against Double Door. The circuit court concluded that Double Door violated the lease and ordered Double Door to vacate the building by December 31, 2016. Double Door failed to comply with the order to vacate and consequently was evicted from the building on February 6, 2017.

---

[2]The zoning committee is a committee of the council of the City and consists of 18 aldermen. At all relevant times, Moreno was a member of the zoning committee.

¶ 14    The complaint alleged that on February 8, 2017—two days after Double Door was evicted—Strauss attended a city hall meeting. Present were, *inter alia*, the commissioner for the City's planning and development department, the chairman of the zoning committee, the zoning administrator, Moreno, and Double Door's owners. At the meeting, the commissioner attempted unsuccessfully to broker a sale of the building to Double Door for a purchase price of $7 million and/or to negotiate a new month-to-month lease between Double Door and the Corporation. Also at the meeting, Moreno warned Strauss that if Double Door were not allowed back in the building, Moreno would make the zoning process very lengthy and expensive and that the building could be vacant for two to five years. Moreno asserted that he decides what kind of tenant goes in the building and that Strauss could avoid problems if Double Door were allowed back in the building at a rent far less than what the market would bear.

¶ 15    The complaint alleged that on February 25, 2017, Moreno confronted Strauss at the building, advising that the building would not have a tenant for three years, that there would be inspectors in the building daily, that Strauss could "come back to [Moreno] on [his] knees," and that the building would be empty with no income for Strauss or his family.

¶ 16    According to the complaint, "conservatively speaking," the space formerly occupied by Double Door normally garnered $35,000 per month in rent. However, the space had been vacant since Double Door's eviction because Moreno's looming downzoning proposal prevented the Corporation from successfully leasing the space, as potential new tenants refused to enter leases unless the zoning classification of the building remained at B3-2.

¶ 17    The complaint alleged that efforts to sell the building were also unsuccessful. On May 10, 2017, a contract was prepared to sell the building to "Buyer A" for $9.6 million. However, Buyer A canceled the contract on June 8, 2017, after learning from Moreno of the pending downzoning amendment. Two days before Buyer A canceled the contract, Moreno proposed a second amendment that would downzone the building to RS-3, which accommodates the development of single-unit, detached houses on individual lots. Moreno proposed this amendment, notwithstanding that the building had never been used as a residential, single unit. Nor was the building detached, as it shared a common wall with a similarly situated

building that was also a commercial establishment with upper-level apartments. On June 22, 2017, the zoning committee deferred the RS-3 downzoning proposal, which, like the B1-1 downzoning proposal, made it available to be called for a vote at any time in the future.

¶ 18    On July 21, 2017, a contract was prepared to sell the building to "Buyer B" for $9.1 million. The contract was made contingent on the building maintaining its B3-2 zoning classification because Buyer B knew of the pending downzoning amendments. Buyer B met with Moreno, then canceled the contract on August 7, 2017, because of the looming downzoning proposals.

¶ 19    In late August 2017, City officials worked with Moreno on a third proposal to downzone the building to B2-2, which is intended to spur development in commercial corridors with low retail demand. The B2-2 zoning classification prohibited more than 30 categories of businesses and allowed fewer types of commercial and retail tenants in the building. The complaint alleged that downzoning to B2-2 would result in a dramatic decrease in the value of the building. Prior to a zoning committee hearing on September 11, 2017, a conversation about the B2-2 proposal was recorded between Moreno and his chief of staff. In the conversation, Moreno stated that he was going to "F*** with them, it makes their lawsuit weaker." At the hearing on that date, the B2-2 zoning amendment was on the deferred agenda. Appended to the complaint is exhibit No. 4, consisting of a transcript of the committee hearing, where Moreno stated, *inter alia*:

> "I humbly ask the committee for support. Planning supports and the law department both support this as a planning tool. And I know many other aldermen *** have done this in other circumstances to get the best for our community and the best for the owner of the building. So this is not something that it's outside the purview of this committee, nor the local alderman, which is me in this case."

¶ 20    At the conclusion of the hearing, the zoning administrator commented that the department did not support the zoning amendment at the outset, but since that time, Moreno worked with the departments of law and planning and development to amend the zoning application to a B2-2 classification, which "has a floor area ratio that is identical to the current zoning on the property of a B3-2, which is no loss of

floor area." For that reason, the department supported the application, the zoning committee passed the B2-2 amendment, and the city council downzoned the building from B3-2 to B2-2.

¶ 21 The complaint alleged that the City's actions "were motivated by Moreno's spiteful effort to get even with Strauss, replete with Moreno's ill will, malice[,] and intent to injure" and that the City "assisted Moreno in his vindictive and irresponsible attack against an innocent and uncooperative land owner who refused to let Moreno's evicted friends back into the building." Ten days after the building was downzoned, Buyer B extended a new offer to purchase the building for $6.5 million, constituting a loss of $3.1 million attributable to the downzoning. The complaint further alleged that, because of the downzoning proposals, the Corporation was unable to lease the space left vacant by Double Door at the market rate for B3-2 properties. In June 2018, the Corporation ultimately sold the building for $9.1 million.

¶ 22 B. Applicable Counts

¶ 23 The allegations of the complaint relevant to this appeal involve violations of substantive due process and equal protection—both pursuant to the Illinois Constitution—and tort claims of intentional infliction of emotional distress, tortious interference with contracts, and tortious interference with prospective economic advantage.

¶ 24 In the substantive due process claim, the Corporation alleged, *inter alia*, that the B2-2 zoning amendment was enacted to satisfy the desire of one individual— Moreno, that no other person or business in the community participated in or supported the proposed amendment, and that every building in the immediate area was zoned at B3 or higher.

¶ 25 In the equal protection claim, the Corporation alleged that the downzoning was illegal spot zoning that was motivated by Moreno's personal agenda; that no other building was downzoned; that the City's actions were objectively unreasonable, intentional, wilful and wanton, and undertaken with malice; and that Moreno's intent to keep Double Door in the building belied any theory that the City may have acted to mitigate the problems associated with Double Door's use of the building.

¶ 26    The tort claims alleged that Moreno intentionally and unjustly interfered with the Corporation's business relationships with prospective buyers and tenants, that Moreno knew of the sales contracts with Buyers A and B and he induced the buyers to cancel their contracts, that Moreno's conduct was extreme and outrageous, and that Moreno exerted intentional pressure to force Double Door back into the building, causing emotional distress to Strauss.

¶ 27                          III. Defendant's Motion to Dismiss

¶ 28    On June 26, 2019, pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2016)), the City filed a motion to dismiss plaintiffs' second amended complaint. The City argued, *inter alia*, that under section 2-615 of the Code (*id.* § 2-615), the equal protection and substantive due process claims failed and Strauss lacked a constitutionally recognized property interest in the building because the Corporation owned the building and Strauss did not. The City also argued that the equal protection and substantive due process claims failed because the complaint established a rational basis for the zoning amendment. The City further asserted the equal protection claim should be dismissed because the Corporation failed to allege the existence of similarly situated comparators. The City emphasized that the Act immunizes public entities from damages claims for any "injury" arising from certain acts and omissions (745 ILCS 10/1-101 *et seq.* (West 2016)) and the Act defines "injury" to include any injury alleged in a civil action, even if the action is based on the Illinois Constitution (*id.* § 1-204).

¶ 29    Under section 2-619 of the Code (735 ILCS 5/2-619 (West 2016)), the City argued that Strauss lacked standing because a shareholder does not have the right to seek damages for injuries to a corporation—even if he is the only shareholder. The City further argued that it was immune from the tort claims under the Act (745 ILCS 10/1-101 *et seq.* (West 2016)).

¶ 30    The Corporation responded that no rational basis supported the downzoning ordinance, as it was motivated by Moreno's personal animus against Strauss. The Corporation added that the Act only applies to actions in tort and does not bar actions for constitutional violations. Regarding standing, Strauss argued that he brought the action individually and doing business as the building corporation— not as a lone shareholder. He asserted that "[p]laintiff consists of Brian Strauss, the

individual, and Brian Strauss, the president of the corporation," that "[t]he corporation speaks through Brian Strauss," and "[t]he injuries that occurred to the corporation, occurred to its president as well."

¶ 31                          IV. Circuit Court Decision

¶ 32      On August 30, 2019, the circuit court entered an order granting the City's motion to dismiss under sections 2-615 and 2-619 of the Code (735 ILCS 5/2-615, 2-619 (West 2016)). Under section 2-615, the circuit court found the equal protection and substantive due process claims failed because a rational basis was established for the City's decision to downzone the building, as the complaint alleged that the lease with Double Door resulted in constant high noise levels, illegal drug use, alcohol abuse, and property damage for many years. The circuit court indicated that there was no allegation that the City had some other basis for its decision to downzone the building but only alleged that Moreno—who is not a party to the litigation—was motivated solely by personal animus. The circuit court took judicial notice that at any given time there were 50 aldermen on the city council, plus the mayor, and concluded that allegations that one of them had an improper motive for seeking the zoning amendment were insufficient to sustain a claim against the City.

¶ 33      Under section 2-619, the circuit court concluded the City was immune from the tort claims under the Act, which applies to all acts of discretion even when abused and Moreno's individual conduct of threatening to rezone the building out of personal animus related squarely to his discretion to do so as an alderman. The circuit court granted the City's motion to dismiss and dismissed plaintiffs' second amended complaint with prejudice in its entirety.

¶ 34                          V. Appellate Court Decision

¶ 35      In reviewing the substantive due process claim, the appellate court observed that the parties disagree about the applicability of the factors established in *La Salle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40 (1957), and *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370 (1960) (*La Salle* factors), which courts sometimes use to review the validity of an ordinance on substantive due

process grounds. 2021 IL App (1st) 191977, ¶ 40. The appellate court noted that the *La Salle* factors are applied to determine whether a zoning action is reasonably related to a legitimate government interest and is a reasonable means to achieve that purpose. *Id.* ¶ 42. The appellate court further observed that not every case challenging a zoning ordinance on the ground of substantive due process has applied the *La Salle* factors. *Id.* ¶ 41.

¶ 36    Here, the appellate court did not apply the *La Salle* factors, as it found the issue was resolved by plaintiffs' complaint itself. *Id.* ¶ 42. Because the complaint described problems associated with Double Door, *i.e.*, excessive noise, illicit drug use, alcohol abuse, and property damage, the appellate court determined that the zoning amendment could be an attempt by the City to prevent those problems from recurring. *Id.*

¶ 37    The appellate court acknowledged that an ordinance is typically invalid where its only justification is that a few individuals want it. *Id.* It noted, however, that "a zoning restriction 'could be good for the public at large even if only one person asked for it.' " *Id.* (quoting *Drury v. Village of Barrington Hills*, 2018 IL App (1st) 173042, ¶ 98). Yet the appellate court indicated that, here, Moreno's agenda was not the only justification for the zoning amendment, as the complaint alleged a rational basis for the amendment. *Id.* Accordingly, the appellate court concluded the substantive due process claim against the City was properly dismissed. *Id.*

¶ 38    The appellate court likewise rejected the equal protection claim because the complaint itself provided a rational basis for the downzoning amendment. *Id.* ¶ 46. Although the Corporation argued that problems with excessive noise, drug and alcohol abuse, and property damage would apply equally to other establishments in the area, the appellate court stressed that the complaint only described such problems associated with Double Door. *Id.* Accordingly, the appellate court determined that the City conceivably enacted the zoning amendment to prevent those problems from recurring in the same location. *Id.* The appellate court further observed that Moreno recommending the zoning amendment out of revenge did not equate to the City endorsing those motives, emphasizing that defendant here is the City—not Moreno. *Id.* The appellate court concluded that, because the City had a rational basis to enact the zoning amendment, the equal protection claim against the City was also properly dismissed. *Id.*

¶ 39   Finally, the appellate court addressed plaintiffs' tort claims, observing that immunity under section 2-201 of the Act is absolute and covers not only negligence but also wilful and wanton conduct with no exception for malicious or corrupt motives. *Id.* ¶ 65. The appellate court determined that Moreno's conduct was both an exercise of discretion and a determination of policy and that his personal animus—malicious as it was—did not preclude immunity to the City under section 2-201 of the Act, as neither the abuse of Moreno's discretion nor his personal motives were part of the calculus. *Id.* ¶¶ 66-68. The appellate court further found that the City was immune under section 2-109 of the Act (745 ILCS 10/2-109 (West 2016)) because Moreno was not liable for injuries resulting from his conduct, and the City was therefore not liable. 2021 IL App (1st) 191977, ¶ 68. Accordingly, the appellate court concluded that the tort claims against the City were properly dismissed. *Id.* ¶ 69. This court allowed plaintiffs' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2020). Station Place Townhouse Condominium Association and Prairie Street Townhomes Condominium Association were granted leave to submit an *amicus curiae* brief in support of plaintiffs' position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 40                                  ANALYSIS

¶ 41                            I. Preliminary Issues

¶ 42   Before turning to the merits of this appeal, we preliminarily address issues of standing and mootness raised by the City.

¶ 43                                 A. Standing

¶ 44   The City contends that Strauss lacks standing to challenge the rezoning ordinance or to raise the tort claims based on the alleged interference with the sale of the property because he never owned the building. The City emphasizes that Strauss is the president of the Corporation that owned the building and, because the Corporation owned the building and Strauss did not, any cause of action belongs to the Corporation, not to Strauss as its president. We note, however, that one of the counts remaining at issue is intentional infliction of emotional distress, which would be the only count applicable to Strauss individually. We agree that the

- 11 -

Corporation has standing to sue as to the remaining counts, and we conclude that, although misnamed as "Brian J. Strauss, individually, and d/b/a 1572 North Milwaukee Avenue Building Corporation," the Corporation was nevertheless identified as a plaintiff in the action.

¶ 45　　It is significant whether a plaintiff sues as a corporation or as an individual because a complaint may be dismissed for lack of standing. See 735 ILCS 5/2-619(a)(9) (West 2016); *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999) (lack of standing is "affirmative matter" supporting dismissal). A corporation is a legal entity that is separate and distinct from its shareholders, directors, and officers who are not ordinarily liable for the obligations of the corporation. See *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 204 (1981); *Capital One Bank, N.A. v. Czekala*, 379 Ill. App. 3d 737, 743 (2008). Furthermore, no individual " 'does business as' " a corporation—not even the corporation's president. *Czekala*, 379 Ill. App. 3d at 743.

¶ 46　　Here, plaintiff's name on the complaint is "Brian J. Strauss, individually, and d/b/a 1572 North Milwaukee Avenue Building Corporation." Plaintiffs contend that this styling of the complaint is a mere misnomer and, thus, not grounds for dismissal. Misnomers most commonly occur when defendants are misnamed, but plaintiffs also sometimes misname themselves. See *U.S. Bank National Ass'n v. Luckett*, 2013 IL App (1st) 113678, ¶ 23. A misnomer is not a basis for dismissal, as it may be corrected anytime. See 735 ILCS 5/2-401(b) (West 2016). However, it is also possible that plaintiffs made a mistake, which usually occurs when the wrong party is named and served. See *Barbour v. Fred Berglund & Sons, Inc.*, 208 Ill. App. 3d 644, 648 (1990). Certain statutory requirements must be met in order to correct a mistaken identity. See 735 ILCS 5/2-616 (West 2016). Courts are more reluctant to allow the correction of a party's name if it is incorrect due to a mistaken identity rather than a misnomer. See *Luckett*, 2013 IL App (1st) 113678, ¶ 21.

¶ 47　　The plaintiff's intent is a crucial component of determining whether a case involves a mistaken identity or a misnomer, and that intent is established by objective manifestations in the record. *Id.* Courts have also deemed the incorrect styling of a party's name a misnomer where an actual plaintiff exists and all the parties are fully aware of the identities of the actual litigants. See *Calvert Distillers Co. v. Vesolowski*, 14 Ill. App. 3d 634, 636 (1973); see also *Bristow v. Westmore*

*Builders, Inc.*, 266 Ill. App. 3d 257, 262 (1994) (incorrect party name a misnomer where the record identifies an entity capable of being sued). Also relevant is whether the misstyled name results in actual prejudice to the defendant. See *Bristow*, 266 Ill. App. 3d at 262.

¶ 48    Here, we conclude that standing is not lacking, as the incorrect styling of plaintiffs' names was a misnomer, rather than a mistaken identity. Although the Corporation was not clearly specified as an individual plaintiff, the complaint makes clear that the Corporation owned the building, thereby making the parties aware of the identities of the actual litigants. See *Calvert*, 14 Ill. App. 3d at 636. We further find the misstyled name results in no actual prejudice to the City, as we resolve this appeal on its merits in favor of the City and affirm the dismissal of the complaint. See *Bristow*, 266 Ill. App. 3d at 262.

¶ 49                                B. Mootness

¶ 50    The City also contends that the dismissal of the complaint should be affirmed because the claims are moot, as the Corporation sold the building in June 2018. We agree that this moots some of the issues in this case but not all of them. See *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009) (courts do not decide moot questions). As to the constitutional claims in the complaint, the Corporation requests a declaration that the ordinance at issue is unconstitutional and also requests money damages. However, declaratory relief cannot provide redress to the Corporation. Because the Corporation sold the building, this court cannot grant effectual relief in declaring the ordinance unconstitutional. See *Holly v. Montes*, 231 Ill. 2d 153, 157 (2008) (appeal moot where court is precluded from granting effective relief to complaining party). The zoning ordinance only applies to the building, which was sold to a third party who is not a party to this litigation.

¶ 51    As to the Corporation's claim for monetary damages for the City's enactment of what it claims is an unconstitutional ordinance, we recognize that this remains a live controversy because this court could grant effectual relief should the Corporation prevail. See *id.* However, because this court will not address a constitutional question if the appeal can be decided on other grounds (*The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 34) and the request for money damages may be resolved pursuant to the Act—which is discussed further

below—we decline to address the Corporation's remaining constitutional claims.

¶ 52                                    II. Merits of the Appeal

¶ 53       Having resolved the mootness issue, we consider whether plaintiffs' various claims for money damages were properly dismissed under section 2-619 of the Code (735 ILCS 5/2-619 (West 2016)) based on immunity provided in the Act (745 ILCS 10/2-101 *et seq.* (West 2016)). Claims dismissed under section 2-619 of the Code are reviewed *de novo*. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 377 (2003).

¶ 54       "The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of litigation." *Id.* at 367. Section 2-619(a)(9) of the Code allows an involuntary dismissal where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2016). " '[A]ffirmative matter,' in a section 2-619(a)(9) motion, is something in the nature of a defense which negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). "The moving party thus admits the legal sufficiency of the complaint, but asserts an affirmative defense or other matter to defeat the plaintiff's claim." *Van Meter*, 207 Ill. 2d at 367. The affirmative matter must be apparent on the face of the complaint or otherwise be supported by affidavits or other evidentiary material. *Id.* at 377. "[W]hen ruling on a section 2-619 motion to dismiss, a court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party." *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352 (2008).

¶ 55       "Affirmative matter" under section 2-619 of the Code may include immunity under the Act. *Van Meter*, 207 Ill. 2d at 377. The Act's purpose "is to protect local public entities and public employees from liability arising from the operation of government." *Better Government Ass'n v. Illinois High School Ass'n*, 2017 IL 121124, ¶ 32. In 1965, the General Assembly enacted the Act (see 1965 Ill. Laws 2982), which adopted the principle that local government entities may be liable in tort but that any such liability is limited by immunities based on certain government functions. *Harrison v. Hardin County Community Unit School District No. 1*, 197

Ill. 2d 466, 471 (2001). Accordingly, the Act governs whether and in what situations local government entities are immune from liability in tort. *Id.*

¶ 56    Because immunity operates as an affirmative defense, the governmental entity has the burden of pleading and proving its immunity under the Act. *Monson v. City of Danville*, 2018 IL 122486, ¶ 23. A plaintiff's right to recovery is barred only when the governmental entity has met this burden. *Van Meter*, 207 Ill. 2d at 370. If no immunity provision applies, the governmental entity is liable in tort to the same extent as private parties. *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 229 (2007).

¶ 57                              A. Sections 2-201 and 2-109 of the Act

¶ 58    Here, the appellate court affirmed the dismissal of the claims for money damages, finding the claims were subject to discretionary policymaking immunity under section 2-201 of the Act. That section provides:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2016).

Also relevant is section 2-109 of the Act, because a governmental entity is "not liable for an injury resulting from an act or omission of its employee where the employee is not liable."[3] *Id.* § 2-109; *Harrison*, 197 Ill. 2d at 471.

¶ 59    Immunity of public officials under sections 2-201 and 2-109 of the Act is premised on the notion that such officials should be permitted to exercise their discretion in rendering decisions without fear of liability for a good-faith mistake. *Harrison*, 197 Ill. 2d at 472. However, this immunity does not apply only to good-faith mistakes. Indeed, "[s]ection 2-201 extends the most significant protection afforded to public employees." *Van Meter*, 207 Ill. 2d at 370. "Immunity under

---

[3]Because the City conceded at oral argument—and the parties do not dispute—that at all relevant times, Moreno was an employee of the City, we assume without deciding that this is the case for purposes of this appeal and make no holding regarding the status of an alderman as an employee of the City.

section 2-201 is absolute, covering both negligent and willful and wanton conduct." *Monson*, 2018 IL 122486, ¶ 29. Immunity under the Act also extends to corrupt and malicious misuse of power, corrupt and malicious motives, and abuse of official process and power. See *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 495-96 (2001). When determining whether immunity attaches under section 2-201, courts look at the conduct itself rather than the intent behind it. *Kevin's Towing, Inc. v. Thomas*, 351 Ill. App. 3d 540, 548 (2004).

¶ 60    There are two requirements for immunity to attach under section 2-201. First, a defendant must prove that the employee held either a position involving the determination of policy or the exercise of discretion. 745 ILCS 10/2-201 (West 2016). Second, the act or omission giving rise to the injury must result from both a determination of policy and an exercise of discretion. *Id.*; *Van Meter*, 207 Ill. 2d at 379.

¶ 61    Policy determinations are "those that require the governmental entity or employee to balance competing interests and to make a judgment call as to what solutions will best serve each of those interests." *Harrison*, 197 Ill. 2d at 472. "Discretionary decisions are 'unique to a particular public office' " (*Monson*, 2018 IL 122486, ¶ 30 (quoting *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995))) and " 'involve the exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed' " (*id.* (quoting *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 394-95 (2000))). Moreover, an employee is charged with exercising his discretion when he is not legally mandated to choose one thing over another and there is no predetermined roadmap for his decision. *Van Meter*, 207 Ill. 2d at 371-72.

¶ 62                                1. *Position*

¶ 63    Regarding the first requirement for immunity to attach under section 2-201, the parties do not dispute that Moreno held a position involving the determination of policy or the exercise of discretion, as these describe the roles of an alderman. See 745 ILCS 10/2-201 (West 2016). Thus, we find the first requirement for immunity to attach under section 2-201 is satisfied.

¶ 64                                    *2. Conduct*

¶ 65        The second requirement for immunity to attach under section 2-201 entails a
determination of whether the act or omission giving rise to the injury resulted from
both a determination of policy and an exercise of discretion. *Id.*; *Van Meter*, 207
Ill. 2d at 379. Plaintiffs argue that the appellate court adopted an overly expansive
interpretation of when a public employee determines policy and failed to address
that Moreno's conduct did not represent an exercise of the "lawful discretion"
afforded to an alderman. The City responds that Moreno was determining policy
and exercising discretion by speaking with Strauss about Double Door, submitting
zoning proposals to the board, and informing potential buyers of the building about
those zoning proposals.

¶ 66                              (a) *Determining Policy*

¶ 67        Plaintiffs argue that the City failed to show that Moreno's conduct reflected a
determination of policy because Moreno acted to intentionally injure plaintiffs.
Although plaintiffs concede that an individual's inward motives are insufficient to
overcome section 2-201 immunity, they maintain that the intentional tortious
character of Moreno's conduct belies any claim that he was determining policy and
is beyond the scope of the immunity afforded by section 2-201. Plaintiffs assert that
section 2-201 does not apply to ordinary tortious conduct that falls outside a
government official's policymaking discretion. In response, the City emphasizes
that policy determinations are exemplified by zoning proposals, which are
fundamental steps toward enacting any ordinance, thus keeping Moreno's conduct
within the scope of immunity under section 2-201. We agree with the City.

¶ 68        The record reflects that Moreno was determining policy, as he was required to
balance competing interests between the Corporation as the building owner, Strauss
as the president of the Corporation, Double Door as a commercial tenant in the
building, neighboring businesses, residential tenants in the building, and the public
community and to make judgment calls as to what solutions would best serve those
interests. See *Harrison*, 197 Ill. 2d at 472. At the September 11, 2017, zoning
committee hearing, Moreno made the following comments demonstrating the
policy determinations at hand:

"Planning supports and the law department both support this as a planning tool. And I know many other aldermen \*\*\* have done this in other circumstances to get the best for our community and the best for the owner of the building. So this is not something that it's outside the purview of this committee, nor the local alderman, which is me in this case."

As observed, the record also reflects that the City did not support Moreno's first two downzoning proposals, thus dispelling plaintiffs' allegation that "the City assisted Moreno in his vindictive and irresponsible attack" and the City's actions "were motivated by Moreno's spiteful effort to get even with Strauss." Indeed, Moreno continued working with the City to amend the zoning proposal and formulate a classification that was the least restrictive of the three proposals, which was ultimately approved by the zoning committee and enacted by the city council. These facts exemplify that policy determinations were taking place, as competing interests were considered and judgment calls were made regarding a solution to best serve each of those interests. See *id.* These facts also belie plaintiffs' allegations that the appellate court adopted an overly expansive interpretation of when a public employee determines policy.

¶ 69                                 (b) *Exercising Discretion*

¶ 70         Besides a determination of policy, the second requirement for immunity to attach under section 2-201 also requires Moreno's conduct to have been an exercise of discretion. See 745 ILCS 10/2-201 (West 2016); *Van Meter*, 207 Ill. 2d at 379. Plaintiffs agree that the immunity afforded by section 2-201 applies where a public employee acts under the unique powers of his office; but they stress that Moreno's conduct was beyond the scope of the immunity afforded by section 2-201. Plaintiffs contend that the immunity does not stretch so far as to cover every tortious act of the employee or any conduct that falls outside statutory or regulatory constraints. Plaintiffs assert that the appellate court's decision violated these principles by incorrectly implying that an alderman has "legal discretion" to tortiously interfere with private contracts and inflict emotional distress by utilizing threats as part of a "pressure campaign" against anyone who opposes his political allies. The City responds that Moreno's conduct—malicious as it may have been—was yet the result of exercising his discretion in making policy determinations regarding the

zoning classification of the building and was likewise within the scope of immunity provided in section 2-201. Again, we agree with the City.

¶ 71 We note plaintiffs' argument and acknowledge that, in some cases, section 2-201 immunity does not apply to conduct that falls outside statutory or regulatory constraints. See *Snyder*, 167 Ill. 2d at 474. However, plaintiffs cite *Snyder* to support this principle. See *id. Snyder* involved the placement of a road sign—deemed by this court to be a ministerial duty that was governed by the Manual on Uniform Traffic Control Devices. *Id.* at 469. In *Snyder*, "tailored statutory and regulatory guidelines place[d] certain constraints on the decisions of officials" that were ministerial in nature (*id.* at 474), whereas here, no such constraints were on Moreno, whose decisions and conduct were wholly discretionary. See *Van Meter*, 207 Ill. 2d at 371-72.

¶ 72 Plaintiffs further contend that immunity under section 2-201 does not apply here because Moreno's acts were not discretionary decisions that were uniquely related to the office of an alderman. See *Monson*, 2018 IL 122486, ¶ 30. Plaintiffs maintain that the office of an alderman does not carry with it the "legal discretion" or the "lawful authority" to interfere with private purchase contracts, to require a landlord to lease his property to a particular tenant, or to confront an individual on private property and inflict emotional distress. Plaintiffs urge that these tortious acts are not unique to an alderman but may be committed independently by many ordinary tortfeasors.

¶ 73 In support, plaintiffs cite *Currie v. Lao*, 148 Ill. 2d 151, 167 (1992), in which immunity did not attach when a state trooper's choices regarding the execution of turns led to an accident. This court concluded that immunity did not apply because choices regarding turns are made by all vehicle drivers and, thus, the activity was not uniquely related to the official duties of a state trooper. *Id.* Plaintiffs further cite *Stratman v. Brent*, 291 Ill. App. 3d 123, 131 (1997), in which immunity did not apply to a police chief's alleged defamatory statements to a third-party, potential employer because past employers speaking to potential future employers was not uniquely related to the police chief's office.

¶ 74 Notwithstanding plaintiffs' arguments to the contrary, we find Moreno's acts constituted exercises of discretion that would not have occurred but for his position as alderman. Because of his aldermanic position, Moreno was required to

personally deliberate and judge whether and in what manner to execute the actions that he did. See *Monson*, 2018 IL 122486, ¶ 30. In doing so, Moreno chose to confront Strauss, meet with prospective buyers of the building, and propose zoning amendments to the zoning committee. Pursuant to established precedent construing the Act, that Moreno may have acted maliciously or corruptly in the process is of no consequence to the application of immunity under section 2-201 of the Act. See 745 ILCS 10/2-201 (West 2016); *Monson*, 2018 IL 122486, ¶ 29; *CDG Enterprises*, 196 Ill. 2d at 495-96; *Kevin's Towing*, 351 Ill. App. 3d at 548.

¶ 75        We further find Moreno's conduct—notwithstanding any underlying malicious intent—was consistent with the requirements for section 2-201 immunity to attach. We note that plaintiffs consistently insert qualifiers to the discretion of an alderman such as "lawful," "legal," and "official." However, the only condition of discretion here is that it be exercised in the context of the unique position of an alderman. See 745 ILCS 10/2-201 (West 2016); *Monson*, 2018 IL 122486, ¶ 30. There are no added prerequisites for the discretion to be "legal," "lawful," or "official." Indeed, the plain language of section 2-201 makes clear that even if the discretion is abused, immunity still attaches, thereby opposing plaintiffs' inclusion of these qualifiers as conditions imposed on the exercise of discretion. See 745 ILCS 10/2-201 (West 2016).

¶ 76        As a final note, pursuant to section 2-109 of the Act, because Moreno is not liable for injuries resulting from his conduct due to discretionary immunity attaching under section 2-201, the City is likewise not liable. See *id.* § 2-109. Likewise, the City is not liable for money damages for the passing of the ordinance at issue because of discretionary immunity under section 2-201 of the Act (*id.* § 2-201), as well as enactment immunity under section 2-103 of the Act (*id.* § 2-103), which immunizes the City from damages claims for injuries arising from the adopting of the zoning ordinance. Moreover, the plain language of the Act applies to claims for damages under the Illinois Constitution. See *id.* § 1-204. Accordingly, as set forth above, this Court has no reason to address the constitutionality of the zoning ordinance that applies to one piece of property that the Corporation has sold, because the Act immunizes the City for claims of damages. For these reasons, we find plaintiffs' claims for money damages were properly dismissed under section 2-619 of the Code. See 735 ILCS 5/2-619 (West 2016).

¶ 77                           CONCLUSION

¶ 78       For the foregoing reasons, we affirm the appellate court's judgment, which upheld the circuit court's dismissal of plaintiffs' second amended complaint.

¶ 79       Judgments affirmed.

¶ 80       CHIEF JUSTICE ANNE M. BURKE and JUSTICE HOLDER WHITE took no part in the consideration or decision of this case.